IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


UNITED STATES OF AMERICA,

v.  CASE NO. 1:88-cr-01026-MP-AK

CHARLES L DAVIS,

    Defendant.

_____/

**O R D E R**

This matter is before the Court pursuant to the Order at Doc. 3397, which required the parties to brief the issues of whether the Sentencing Guidelines, the abolition of parole, supervised release, and the implementation of mandatory minimums applied to the charges to which Mr. Davis has pled guilty.  The parties have each filed memoranda, docs. 3398 and 3399, respectively.

The following facts are alleged in the Defendant's memorandum.  From March 1, 1985 to February 3, 1987, Mr. Davis participated in a drug-smuggling conspiracy by intermittently working as a mechanic to ensure the serviceability and seaworthiness of vessels used to smuggle marijuana.  In February 1987, Mr. Davis served as the captain of the *Suntimes*, a boat which carried a shipment of marijuana destined for Florida. However, upon learning that a co-conspirator's boat had been seized in the Cayman Islands and the crew arrested, Mr. Davis contacted Terry Fitzwater, one of the leaders of the conspiracy, and advised him he would not deliver the shipment to Florida.  Due to Mr. Davis's refusal to deliver the shipment, Mr. Fitzwater was forced to hire another crew to take over the boat's operation which had been diverted to Cozumel, Mexico.  U.S. authorities subsequently intercepted the *Suntimes* in Destin,

Florida, seized the marijuana shipment, and arrested the replacement crew.

At the time of the seizure, Mr. Davis was in Destin, Florida, at the request of Mr. Fitzwater, to make sure the arriving *Suntimes* was seaworthy for its return to Ft. Lauderdale. After the seizure, Mr. Fitzwater told everyone to "lay low." Several weeks later, Mr. Davis met with Mr. Fitzwater, once again at Fitzwater's request. During their meeting, Mr. Fitzwater told Mr. Davis to disappear and said he would forward him false identification. However, Mr. Davis became concerned when Mr. Fitzwater encouraged him to meet him in St. Maarten and suggested possibly sailing to South America. Mr. Davis thought this request peculiar in light of the fact that he had just abandoned a load in Cozumel which was seized shortly thereafter by U.S. authorities.

Frightened and worried that Mr. Fitzwater might make arrangements to have him killed, Mr. Davis agreed to meet Fitzwater in St. Maarten, even though he had already decided to vanish and cease any further communications with his former co-conspirators. Mr. Davis never made the meeting in St. Maarten. Instead, he broke off communications with Mr. Fitzwater and assumed the identity of "John Fullerton." He moved to St. Thomas, obtained lawful employment, and never again spoke to any of his former co-conspirators. Ultimately, he reestablished himself in Maryland and was never involved in any further activities of the charged conspiracy.

Eventually, Mr. Davis was charged in the Fifth Superseding Indictment in sixteen counts. The Counts can be grouped as follows:

I. Conspiracy Offenses:

    1. Count Two: Conspiracy to import marijuana, hashish oil and cocaine into the United States in violation of 21 U.S.C. § 963, from 1976 to the

    date of the indictment.  (More than 1000 kg of marijuana, more than one kg of hashish oil, more than five kg of cocaine)

  2. Count Three: Conspiracy to distribute and to possess with intent to distribute the same substances as in Count Two, from 1976 to the date of the Indictment, in violation of 21 U.S.C. § 846. (More than 1000 kg of marijuana, more than one kg of hashish oil, more than five kg of cocaine)

II. Substantive Offenses:  (each count also alleges aiding and abetting under 18 U.S.C. § 2)

  1. Trips taken March through May, 1985

    a. Marijuana (more than 50 kg)

      i. Count 7: Importing marijuana in violation of 21 U.S.C. § 952
      ii. Count 8: Possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841

    b. Hashish Oil (more than 1 kg)

      i. Count 9: Importing hashish oil, in violation of 21 U.S.C. § 952
      ii. Count 10: Possessing with intent to distribute hashish oil, in violation of 21 U.S.C. § 841

    c. Count 11: Traveling in foreign commerce to carry on unlawful activity, in violation of 18 U.S.C. § 1952(a)(3)

  2. Trips taken November through December, 1985

    a. Marijuana (more than 50 kg)

      i. Count 20: Importing marijuana in violation of 21 U.S.C. § 952
      ii. Count 21: Possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841

    b. Count 22: Traveling in foreign commerce to carry on unlawful activity, in violation of 18 U.S.C. § 1952(a)(3)

  3. Trips taken March through April, 1986

    a. Marijuana (more than 50 kg)

      i. Count 23: Importing marijuana in violation of 21 U.S.C. § 952

         ii. Count 24:  Possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841

    b. Count 25: Traveling in foreign commerce to carry on unlawful activity, in violation of 18 U.S.C. § 1952(a)(3)

4. Trips taken November 1, 1986 through February 3, 1987

    a. Marijuana (more than 100 kg)

        i. Count 30:  Importing marijuana in violation of 21 U.S.C. § 952
        ii. Count 31: Possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841

    b. Count 32: Traveling in foreign commerce to carry on unlawful activity, in violation of 18 U.S.C. § 1952(a)(3)

As can be seen above, the offenses to which Mr. Davis has pled guilty spanned a time period from 1976 to at least 1987.  As explained more fully below, between 1984 and 1988, the criminal laws covering distribution and importation of controlled substances were amended at least five times, with each amendment affecting one or more of the following four facets of modern-day sentencing: (1) applicability of mandatory minimum sentences; (2) eligibility for sentencing-shortening parole; (3) applicability of post-confinement monitoring such as special parole or supervised release; and (4) applicability of the previous three facets to conspiracy convictions in addition to substantive convictions.  We are now faced with the task of determining which of the four facets of sentencing, from which of the five versions of the criminal drug laws, apply to each of the sixteen counts of the Fifth Superseding Indictment to which Mr. Davis has pled guilty.

We must first trace in more detail the relevant statutory history of the federal drug enforcement penalty scheme and of federal sentencing in general.  The following discussion borrows heavily from the United States Supreme Court's watershed decision in <u>Gozlon-Peretz v.</u>

United States, 498 U.S. 395 (1991).

We begin with the state of the law in 1982. The applicable law was the Controlled Substances Act, Pub.L. 91-513, Tit. II, § 401(b), 84 Stat. 1260, codified at 21 U.S.C. § 841(b). When first enacted, § 841(b) subjected offenders involved in the manufacture or distribution of Schedule I and II[1] narcotic substances to a maximum of 15 years' imprisonment and, if a prison sentence was imposed, to a mandatory 3-year term of special parole. 21 U.S.C. § 841(b)(1)(A) (1982 ed.). Special parole was "a period of supervision served upon completion of a prison term" and administered by the United States Parole Commission. Bifulco v. United States, 447 U.S. 381 (1980); 21 U.S.C. § 841(c) (1982 ed.), repealed, Pub.L. 98-473, Tit. II, § 224(a)(6), 98 Stat. 2030.

In 1984, as part of a larger bill, Congress enacted two statutes that altered the penalty schemes for federal drug offenders: the Controlled Substances Penalties Amendments Act, Pub.L. 98-473, Tit. II, ch. V, 98 Stat. 2068, and the Sentencing Reform Act, Pub.L. 98-473, Tit. II, ch. II, 98 Stat. 1987.[2] The Controlled Substances Penalties Amendments Act increased the maximum prison terms available under the Controlled Substances Act for offenses involving

---

[1] The Controlled Substances Act established five "schedules" of narcotic and nonnarcotic substances subject to federal drug laws, codified at 21 U.S.C. § 812. Under that schedule, opiates and cocaine were the major narcotic substances, while LSD, PCP, methamphetamines, marijuana and hashish were nonnarcotic. Prior to 1984, 21 U.S.C. § 841(b)(1)(A) applied to offenses involving narcotics listed in Schedules I and II, those considered by Congress to present the highest potential for abuse. See 21 U.S.C. §§ 812(b)(1) and (b)(2) (1982 ed.). Persons convicted of offenses involving other illicit drugs were subject to various, lesser penalties under 21 U.S.C. §§ 841(b)(1)(B), (b)(2) and (b)(3) (1982 ed.).

[2] Both statutes were enacted as part of the Comprehensive Crime Control Act of 1984, Pub.L. 98-473, Tit. II, 98 Stat.1976, a lengthy piece of legislation that brought about significant revisions to many other aspects of the federal criminal justice system including forfeiture, bail, and procedures for the treatment of juvenile and mentally ill defendants.

*Case No: 1:88-cr-01026-MP-AK*

large quantities of narcotic substances[3] to 20 years, but did not provide any term of special parole for such offenses. 21 U.S.C. § 841(b)(1)(A) (1982 ed., Supp. II). Persons convicted of crimes involving lesser amounts of narcotic and nonnarcotic substances remained subject to the penalties applicable to offenses committed before the 1984 amendments, including special parole. §§ 841(b)(1)(B) and (C). Thus, while increasing the maximum terms of imprisonment for large-scale narcotics offenses, the 1984 amendments created a peculiar situation in which small-time offenders were subject to special parole, while big-time offenders were not.

Concurrent with the increases in maximum penalties for large-scale narcotics offenses, the Sentencing Reform Act of 1984 modified the penalty scheme for federal drug offenders by deleting all remaining references to special parole in the pre-1984 version of the Controlled Substances Act, but this modification did not become effective until November 1, 1987.[4] The change reflected Congress' desire to eliminate most forms of parole and, with regard to the postconfinement special parole, to replace it with the new system of supervised release. Under the Sentencing Reform Act's provisions for supervised release, the sentencing court, rather than the Parole Commission, would oversee the defendant's postconfinement monitoring. See 18 U.S.C. §§ 3583, 3601. The court could terminate, extend, or alter the conditions of the term of supervised release prior to its expiration. § 3583(e). In the event of a violation of the supervised release order, the court could hold a defendant in contempt. § 3583(e)(3).

---

[3] Large-scale drug offenses under the Controlled Substances Penalties Amendments Act included those involving 100 grams or more of heroin, 1 kilogram or more of cocaine, and 5 grams or more of LSD. See 21 U.S.C. § 841(b)(1)(A) (1982 ed., Supp. II).

[4] As enacted, the Sentencing Reform Act provided that the elimination of special parole terms would take place on November 1, 1986. The effective date of these amendments, however, with many of the Sentencing Reform Act's other key provisions, was delayed until November 1, 1987. See Sentencing Reform Amendments Act of 1985, Pub.L. 99-217, § 4, 99 Stat. 1728.

Having decided upon supervised release as its preferred means of postconfinement monitoring, Congress nevertheless decided to defer its application to drug offenses. Although the Sentencing Reform Act established conditions for supervised release, and although the Act took the further step of eliminating references to special parole for most drug offenses, Congress did not take the final step of requiring supervised release for persons sentenced under the Controlled Substances Act. That step was taken two years later, when Congress enacted the Anti-Drug Abuse Act of 1986 (ADAA), Pub.L. 99-570, 100 Stat. 3207, 3207-2 to 3207-4.

For Mr. Davis, however, counts 7,8,9,10,20,21,23, and 24 allege substantive violations of 21 U.S.C. § 841 and 952 occurring before the ADAA but after the 1984 Act. The types and amount of drugs alleged in each count places him in 841(b)(1)(B) and in 960(b)(2) for each count. Because no part of the 1984 Act delayed the effectiveness of the penalty provisions contained therein, they are presumed to be effective on the date of enactment. Thus, defendant faces the maximum incarceration and fine penalties from the 1984 Act, which are 15 years imprisonment and a $125,000 fine. However, the penalty provisions of the 1984 Act did not themselves make drug crimes non-parolable, and the general abolition of parole found in the Sentencing Reform Act was expressly delayed until November of 1987. Thus, for these counts, involving conduct before the ADAA was enacted, Mr. Davis is eligible for parole. The same analysis applies to mandatory minimums, which were not added until the ADAA in October 1986. Finally, the language of the penalty provisions of the 1984 Act retained the references to special parole, and the implementation of supervised release was expressly delayed. Therefore, he faces 3 years special parole on all these counts.

Counts 30 and 31, on the other hand, are the only ones that allege substantive violations

of 21 U.S.C. § 841 and 952 by Mr. Davis that occurred after the ADAA. So we must now turn to the changes wrought by the ADAA in 1986. The ADAA again redefined and expanded the offense categories codified in 21 U.S.C. § 841(b) and, in so doing, increased the maximum penalties and set mandatory minimum penalties for many offenders. ADAA § 1002 created a new drug penalty classification for large-scale offenses involving certain narcotics, such as those involving more than one kilogram of heroin. For first-time offenders in these high-volume narcotics crimes, Congress authorized the now-familiar sentences of 10 years to life imprisonment. 21 U.S.C. § 841(b)(1)(A) (1982 ed., Supp. IV). For midrange violations, such as those involving between 100 kilograms and 1000 kilograms of marijuana, Congress authorized sentences of between 5 and 40 years' imprisonment. § 841(b)(1)(B). Other violations involving Schedule I or II substances were subject to a maximum of 20 years' imprisonment. § 841(b)(1)(C). The penalties for other drug offenses remained mostly unchanged.

The continued applicability of special parole versus supervised release was never completely clear during and after the passage of the ADAA. The House and Senate versions of the ADAA, in their original forms, required that special parole terms be imposed as part of the package of penalties for major narcotics offenses under §§ 841(b)(1)(A), (B), and (C). See H.R. 5484, 99th Cong., 2d Sess. (1986); S. 2878, 99th Cong., 2d Sess. (1986). Under both bills, the special parole provisions were to become effective immediately and to apply until the effective date of the new federal sentencing system, November 1, 1987. As of that date, the House bill provided for the repeal of the special parole provisions, while the Senate bill provided that all references to special parole be changed to supervised release. See H.R.Rep. No. 99-845, p. 20 (1986); 132 Cong.Rec. (1986) (§ 608(b) of House bill); id., at 26101 (§ 1007 of Senate bill).

Neither of these alternatives was adopted, however. Instead, in the final stages of the legislative process, and without explanation, Congress substituted the words "supervised release" for the words "special parole" whenever the latter term appeared in § 1002. See id., at 32728-32745. Thus, as enacted by Congress, § 1002 of the ADAA, 21 U.S.C. § 841(b)(1)(B)[5] (1982 ed., Supp. IV), provides in relevant part:

> such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years....a fine not to exceed...$2,000,000....Any sentence under this subparagraph shall, in the absence of ... a prior conviction, impose a term of supervised release of at least 4 years in addition to such term of imprisonment and shall, if there was ... a prior conviction, impose a term of supervised release of at least 8 years in addition to such term of imprisonment.... No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

In similarly worded passages, Congress also required sentencing courts to impose supervised release terms of at least five and three years for first-time offenders sentenced under §§ 841(b)(1)(A) and (C), respectively, and to double those terms for repeat offenders. In contrast to other sections in the ADAA for which Congress specified November 1, 1987, as the effective date, ADAA § 1002 gave no such direction.

The absence of an express deferral of ADAA § 1002's effective date, coupled with the delayed effective date of the Sentencing Reform Act's provisions governing supervised release, created a conflict of interpretation among the Courts of Appeals. The persons affected by the interpretive problem are those whose offenses occurred between October 27, 1986, the date on which ADAA was signed into law, and November 1, 1987, the effective date of the Sentencing Reform Act's provisions for supervised release. For Mr. Davis, counts 30 and 31 fall within this

---

[5] As discussed below, the drug amounts alleged in counts 30 and 31 make Mr. Davis fall into this section for those counts.

interim period, since they allege substantive violations of 21 U.S.C. § 841 and 952 occurring between November 1, 1986 and February 3, 1987.

The Supreme Court in Gozlon-Peretz resolved the conflict by holding that the provisions of § 1002 of the ADAA (which include mandatory minimums, increased maximums, supervised release and non-parolability) took effect upon the October 27, 1986 enactment of the ADAA as opposed to later, when the Sentencing Reform Act took effect on November 1, 1987.  The Court first noted that "[i]t is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment," and then concluded, "[w]e find no such contrary direction in the language of § 1002 or in its evident purpose."  Thus, with regard to mandatory minimums, the Court stated

> In December 1987, Congress enacted legislation ensuring that the provisions permitting departures from mandatory minimum sentences for cooperating defendants would apply to offenses committed before November 1, 1987. See Sentencing Act of 1987, Pub.L. 100-182, § 24, 101 Stat. 1271.  This corrective statute can be explained only if Congress believed that the mandatory minimum penalties had gone into effect as of the ADAA's date of enactment, October 27, 1986.

The Gozlon-Peretz Court also held that the supervised release provisions of 21 U.S.C. § 841(b)(1)(A) and (B) became effective on October 27, 1986, the day the ADAA was enacted. Also, § 1002 contains a non-parole provision, to which the Eleventh Circuit has applied the reasoning of Gozlon-Peretz.  U.S. v. Giltner, 972 F.2d 1563 (11th Cir. 1992) ("Therefore, we hold that the non-parole provisions contained within section 1002 and 1302 became effective on October 27, 1986, and were in effect when [the defendant] committed his offenses.").

Thus, for substantive violations of 21 U.S.C. § 841(b)(1)(B) committed between October 27, 1986 and November 1, 1987, defendants face the increased maximum imprisonment and

fines from the ADAA, the mandatory minimums from the ADAA, the non-parole provisions of the ADAA, and the supervised release provisions from the ADAA. Also, the language of 21 U.S.C. § 960, which provides the penalties for importation of controlled substances, exactly tracked the language of § 841(b). Thus, the above penalties and analysis apply equally to violations of 21 U.S.C. § 952, punishable by § 960.

Based on the above, for the offenses in Counts 30 and 31, involving more than 100 kilograms of marijuana during the interim period between the ADAA and the effective date of the Sentencing Reform Act, Mr. Davis faces the following penalties: five years mandatory minimum imprisonment, 40 years maximum imprisonment, $2,000,000 fine, and 4 years supervised release. He also may not be placed on parole with regard to the sentences on these counts.

The above analysis leaves two sets of counts remaining, those involving violations of 18 U.S.C. § 1952(a)(3) [counts 11, 22, 25 and 32], and those involving conspiracies [counts 2 and 3]. The section 1952(a)(3) counts can be dealt with easily. The penalty provisions of 18 U.S.C. § 1952(a)(3) did not change with the passage of the ADAA and remained as five years maximum imprisonment and a $10,000 fine. There was never a period of postconfinement monitoring (like supervised release or special parole) required, and there was never any mandatory minimum sentences applied. Also, § 1952 did not itself refer to non-parolability and thus nothing would have eliminated parole for violations of § 1952 until the general abolition of parole that occurred on the effective date of the Sentencing Reform Act in November of 1987. Since all of the § 1952 violations occurred before that date, the defendant faces the following penalties on each of counts 11,22,25, and 32: 5 years maximum imprisonment with no mandatory minimum, a

$10,000 fine, and no supervised release or special parole.  Defendant is eligible for parole for those counts.

Finally, the issue is more complex with regard to the conspiracy offenses in Counts Two and Three.  During the entire period from 1982 to November 18, 1988, if an offender conspired to commit violations of 21 U.S.C. § 841, in violation of 21 U.S.C. § 846, or conspired to commit violations of 21 U.S.C. § 952, in violation of 21 U.S.C. § 963, he faced the following penalty language in both 21 U.S.C. § 846 and 963:

> Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment for the offense, the commission of which was the object of the conspiracy.

Note that the conspiracy penalty language allowed only for "imprisonment or fine or both" and limited the amount of each by stating that they may not exceed "the maximum punishment for the [underlying] offense."  Thus, the conspiracy language did not address mandatory minimums, eligibility for sentence-shortening parole, or application of postconfinement monitoring such as special parole or supervised release.

On November 18, 1988, Congress amended sections 963 and 846 to read:

> Any person who attempts or conspires to commit any offense defined in the subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

This language fixed the problem, and simply made the punishment for conspiracy match the punishment for substantive offenses.  But what about conspiracy convictions for conduct before the change in language?  In <u>Bifulco v. U. S.</u>, 447 U.S. 381, 100 S.Ct. 2247 (1980), applying the initial language quoted above, the Supreme Court determined that the imposition of a special parole term for conspiracy offenses was not authorized, because a term of special

parole was distinct from a term of imprisonment or a fine -- despite the fact that special parole was expressly available for violations of the underlying substantive offense.

The Eleventh Circuit has applied the Bifulco reasoning to the issue of whether mandatory minimums apply to conspiracy counts alleging conduct after the ADAA but before the November 18, 1988 amendment of the conspiracy statutes. In Rush, the Eleventh Circuit held that mandatory minimums could not be applied:

> We think it is clear that 21 U.S.C. § 963, at the time of defendant's crimes, did not address, much less require, minimum sentences. Although the statute expressly addressed the "maximum punishment," it was silent about any minimum. The use of the word "imprisonment" does not imply a minimum term....In such circumstances, we hold that no minimum terms of imprisonment applied to defendants.

Additionally, in this very case, the undersigned has previously analyzed the non-parole provisions of the ADAA in relation to the conspiracy language above and determined that the non-parole provisions of the ADAA did not apply to conspiracies that concluded before the effective date of the Guidelines and Sentencing Reform Act. See Order regarding Michael Knowles, doc. 2916 (analyzing the application of Bifulco to the provisions of the ADAA in conspiracy cases and concluding, "[u]nder the logic of the overwhelming weight of authority, this court now holds that the non-parole provisions found in the substantive offenses at § 841 and § 960 of the ADAA cannot be applied to conspiracy offenses under § 846 and § 963 occurring during the interim period of October 27, 1986, to November 1, 1987").[6] Since Mr. Knowles was

---

[6] Originally, the Eleventh Circuit found that the record in this case did not contain evidence proving that the conspiracy continued after November 1, 1987. United States. v. Knowles, 66 F.3d 1146, 1163-64 (11th Cir. 1995). Thus, at the time of the order at doc. 2916, the law of the case was that the conspiracy had terminated prior to the effective date of the Guidelines and Sentencing Reform Act. However, as discussed previously by this Court, this finding has since changed as new evidence was presented. The basis of the Eleventh Circuit's finding that the conspiracy ended pre-Guidelines was that the testimony of Mark Govea, concerning the use of the boat Olives by Archie Jones for a drug run in December of 1987, "alone [was] insufficient to tie Archie Jones' venture in December 1987 to the charged conspiracy." Id. In the trial of Jose Sepulveda, however, the government offered additional

convicted only of conspiracy offenses and, at the time, the conspiracy was found to have ended before the effective date of the Sentencing Reform Act, the non-parole provisions of §§ 841 and 960 were held to not apply to Mr. Knowles.

As noted in footnote six, however, the law of the case is now that the conspiracy continued past November 1, 1987, though no evidence exists that it continued past November 18, 1988, the date the conspiracy penalty language was amended.  Thus, the question is whether this Court's previous ruling that parole is available for the conspiracy offenses in this case should be applied now that we know the conspiracy extended beyond the November 1, 1987 effective date.

The Court agrees with its sister court in Curbelo v. United States, 993 F.Supp. 1479 (S.D.Fla.,1998) that it should not.  The Sentencing Reform Act's complete abolition of parole for all offenses, effective November 1, 1987, rendered the Bifulco argument moot for conspiracies which continued after that date.  As the Curbelo court put it

> [f]or offenses committed after November 1, 1987, there is no eligibility for parole even if the corresponding statute fails to specifically require imposition of a non-parolable sentence.  After the effective date of the Guidelines any such non-parolable conditions in the statutes would be meaningless and redundant because the Guidelines entirely abolished parole.

Id. at 1482.  Similarly, the overall adoption of the supervised release scheme found at 18 U.S.C. § 3583, and made effective on November 1, 1987, authorizes the application of supervised release to the conspiracy offenses of Mr. Davis.  The undersigned determines, however, that no provision of the Sentencing Reform Act or Guidelines authorized mandatory minimums for

---

testimony regarding four cashier's checks distributed in November of 1987 and regarding Mr. Sepulveda's communications with Archibald Jones concerning the trading of the Olives for another boat, in order to sink the Olives.  See Presentence Report ¶¶ 50,51; Transcript of Sentencing, doc. 3247, pp. 147-48.  Based on such testimony, the undersigned concluded during sentencing that the evidence now clearly indicates that the conspiracy continued after the effective date of the Act. See Transcript of Sentencing, doc. 3248, pp. 90,93, and 105.  This decision was upheld on appeal, Doc. 3321, pp 2-3, n.1.

conspiracies under 21 U.S.C. §§ 846 and 963 until the November 18, 1988 amendment to the conspiracy statutes. Thus, the mandatory minimum provisions of the ADAA cannot be applied to conspiracy offenses that terminated before the November 18, 1988 amendment of the conspiracy statutes.

The bottom line from the above rulings is that with regard to conspiracy convictions, whether or not Mr. Davis withdrew from the conspiracies in February of 1987, he would face for each count a maximum of life imprisonment, a $4,000,000 fine, and no mandatory minimum imprisonment. If he did withdraw from the conspiracy in February of 1987, he would be eligible for parole and would not be subject to post-confinement supervised release or special parole. If he did not withdraw from the conspiracy, however, he would not be eligible for parole and would be subject to supervised release of 5 years to life.

We must therefore turn to the question of whether Mr. Davis withdrew from the conspiracy. Following enactment of the Sentencing Reform Act, numerous appellate courts addressed the question of whether the Act applied to "straddling" conspiracies, i.e., conspiracies which began prior to and continued after the enactment of the Act. See United States v. Bakker, 925 F.2d 728, 739 (4th Cir.1991). In addressing this question, the Eleventh Circuit concluded that a conspiracy that began before the effective date of the Act and continued after that date is subject to sentencing under the Act. United States v. Terzado-Madruga, 897 F.2d 1099, 1123 (11th Cir.1990). This determination that the Act applies to "straddling" conspiracies eventually led to a more complex question - whether a defendant is subject to the Act when he was involved in a "straddling" conspiracy but committed no overt acts after the date of the enactment of the Act. The Eleventh Circuit held that if an "alleged conspirator can meet his burden of proving

withdrawal from the conspiracy before November 1, 1987, then the ex post facto clause may bar application of the Guidelines, notwithstanding the fact that the conspiracy may have continued beyond this date." United States v. Pippin, 903 F.2d 1478, 1481 (11th Cir. 1990). The issue, therefore, becomes whether Mr. Davis can meet his burden of proving withdrawal.

This issue was directly addressed by the Eleventh Circuit in United States v. Finestone, 816 F.2d 583 (11th Cir. 1987). In Finestone, the defendant argued that the statute of limitations had run on his crime because he had withdrawn from the conspiracy several years before the conspiracy terminated. The Finestone panel rejected his argument, noting that

> [a] conspirator can overcome the presumption of his continued participation in the conspiracy by showing that he withdrew from it. Withdrawal, however, is an affirmative defense, which the defendant has the burden of proving. The defendant's burden in this regard is substantial. To establish that he withdrew from a conspiracy, the defendant must prove that he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, and either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities. A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal.

Id. at 589 (internal citations omitted).

Here, Mr. Davis argues that by failing to show up for a scheduled meeting with Mr. Fitzwater, and thereafter dropping out of sight, he communicated to his former co-conspirators that he intended to disavow the conspiratorial objectives. The Court finds, however, that this is merely passive "cessation of activity in the conspiracy" and not the kind of "affirmative steps" required under the law. Mr. Davis' actions could easily be interpreted as simply lying low, which Mr. Fitzwater had at one time directed, and he could have returned to active participation in the conspiracy at any time. Nothing in the written arguments of the parties or the testimony taken in the hearing on this issue convinces the Court that Mr. Davis has satisfied his burden of

proving that he withdrew from the conspiracy.  Accordingly, on counts two and three, he is subject to the Guidelines, to the abolition of parole and to the supervised release provisions which became effective on November 1, 1987.

It is therefore

**ORDERED AND ADJUDGED:**

The probation office is directed to prepare a pre-sentence report in accordance with the rulings above.  The Clerk is directed to set this matter for sentencing at a time which allows the probation office reasonable time to prepare this pre-sentence report.

**DONE AND ORDERED** this  *9th*   day of December, 2005

                *s/Maurice M. Paul*
          Maurice M. Paul, Senior District Judge